**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **MYRON JOHNSON,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **No. 3:18-cv-00120** |
| **v.** | ) | **Judge Trauger** |
| | ) | |
| **DARREN SETTLES, Warden,** | ) | |
| | ) | |
| | ) | |
| **Respondent.** | | |

<u>**MEMORANDUM**</u>

Myron L. Johnson, an inmate of the Hardeman County Correctional Facility in Whiteville, Tennessee, filed a pro se petition for writ of habeas corpus challenging his 2008 conviction and sentence for first degree premeditated murder, first degree felony murder, and especially aggravated robbery for which he is currently serving a term of life imprisonment plus sixty years in the Tennessee Department of Correction. (Doc. No. 1).

The respondent has responded to the habeas petition. (Doc. No. 13). The petition is ripe for review, and this court has jurisdiction pursuant to 28 U.S.C. § 2241(d). Having fully considered the record, the court finds that an evidentiary hearing is not needed, and the petitioner is not entitled to relief. The petition therefore will be denied and this action will be dismissed.

**I.      Procedural History**

On May 1, 2008, Myron L. Johnson was convicted by a Davidson County jury of premeditated first degree murder, first degree murder, and especially aggravated robbery. *State v. Johnson*, No. M2008-02198-CCA-R3-CD, 2010 WL 521028, at *1 (Tenn. Crim. App. Feb. 12, 2010), *perm. app. denied* (Tenn. May 12, 2010). The trial court merged the felony murder and premeditated murder counts and sentenced the petitioner to life imprisonment for the murder plus

sixty years for the especially aggravated robbery. *Id.* at *3. The petitioner appealed, and the Tennessee Court of Criminal Appeals affirmed on February 12, 2010. *Id.* at *1. The Tennessee Supreme Court denied the petitioner's application for discretionary review on May 12, 2010. *Id.*

On October 6, 2010, the petitioner filed a petition for post-conviction relief. Following an evidentiary hearing, the post-conviction court denied the petition. *Myron Johnson v. State,* No. M2016-01361-CCA-R3-PC, 2017 WL 1427254, at *1 (Tenn. Crim. App. Feb. 14, 2017), *perm. app. denied* (May 18, 2017). The petitioner filed a timely notice of appeal, and the Tennessee Court of Criminal Appeals affirmed the denial of post-conviction relief on March 2, 2017. *Id.* at *1. The Tennessee Supreme denied the petitioner's application for discretionary review on April 21, 2017. *Id.*

While Petitioner's post-conviction proceedings were ongoing, he filed a petition for writ of state habeas corpus. (Doc No. 12, Attach. 18 at 12-13). The trial court summarily dismissed the petition. (*Id.* at 51-54). On appeal, the Tennessee Court of Criminal Appeals affirmed the summary dismissal of the petition. *Johnson v. State*, No. M2013-02314-CCA-R3-HC, 2014 WL 3696261, at *1 (Tenn. Crim. App. July 24, 2014) *perm. app. denied* (Tenn. Nov. 21, 2014). The Tennessee Supreme Court denied discretionary review of this decision. (Doc. No. 12-21, Page ID# 1497.)

On February 1, 2018, the petitioner filed the instant pro se petition for writ of habeas corpus (Doc. No. 1) and a memorandum in support of his petition (Doc. No.2). By order entered on April 2, 2018, the court directed the respondent to file an answer, plead or otherwise respond to the petition in conformance with Habeas Rule 5. (Doc. No. 6). The respondent filed his response on June 13, 2018, conceding that the petition is timely and urging the court to dismiss the petition. (Doc. No. 13).

In his petition, the petitioner asserts four grounds for relief: (1) the trial court erred when it did not declare a mistrial after the victim's mother fainted in the courtroom; (2) the trial court erred by allowing accomplice testimony about the petitioner's prior bad acts; (3) trial counsel provided ineffective assistance of counsel; (4) and appellate counsel provided ineffective assistance of counsel. (Doc. No. 1).

## III.   Summary of the Evidence

### A.   Trial Proceedings

The Tennessee Court of Criminal Appeals summarized the proof adduced at the petitioner's jury trial as follows:

> On July 22, 2001, Detective Brad Corcoran with the Nashville Metropolitan Police Department was called to the scene of an abandoned truck off Old Hickory Boulevard. The body of the victim, Eugene "Juan" McAdams, was discovered in the bed of the truck covered with a white sheet; his ankles and wrists had been duct-taped. Following an autopsy, the cause of death was determined to be asphyxia and blunt force trauma to the head.
>
> Initially, investigators were unable to develop a suspect. Several years later, Alvin Stokes, aka "Brother Gold," was facing federal drug trafficking charges. In the hopes of receiving favorable consideration on his sentence, Stokes provided Detective Derry Baltimore with the names of the Defendant, Christopher Nunley, and Paul Anderson as the possible perpetrators of the killing of the victim. Detective Baltimore interviewed Nunley on February 17, 2005. Nunley took Det. Baltimore to the house where the murder occurred, and Det. Baltimore also verified Nunley's phone number. After interviewing Nunley, Det. Baltimore proceeded to interview Anderson on May 12, 2005. Anderson provided details about the murder of the victim.
>
> Anderson testified against the Defendant at trial. Anderson stated that he met the Defendant in 2000, and the two became good friends. Anderson moved into the Defendant's girlfriend's house, and Anderson confirmed that he was drug addict during this time. He had also met Nunley on at least two occasions prior to the murder and knew him as "Skinny." According to Anderson, the Defendant and Nunley were involved together in the sale of drugs, and they often went to Stokes to get drugs.
>
> On July 20, 2001, around 10:00 a.m., the Defendant came over to the place where Anderson was temporarily residing. The Defendant made a proposition to

Anderson: In exchange for $500 and an ounce of cocaine, Anderson was to set up a drug deal with the victim and rob him of his drugs and money.

Anderson stated that the Defendant and Nunley were angry with the victim because he had tried to go around them in the drug trade; normally, they would purchase cocaine from the victim for $22,000 and then sell it for $26,000. However, the victim had slipped a note into the cocaine, providing a cell phone number and stating to the second buyer to deal with the victim directly. Anderson did not know the victim prior to July 20.

Nunley called the victim and arranged the deal. The plan was for Anderson to arrive to purchase four ounces of cocaine from the victim, but instead he would rob everyone. They were to later split the drugs and money. The Defendant arrived in his truck with Nunley around 7:00 p.m. that evening to pick up Anderson, and they went to Nunley's house. However, the Defendant and Nunley stated that they wanted to change the amount to eighteen ounces, "a half of key." Anderson no longer wanted to participate because he feared that there would be repercussions for stealing such a large amount of cocaine. The Defendant instructed him to be quiet and sit down; Anderson complied. Nunley phoned the victim requesting the increased amount of cocaine.

While they were waiting on the victim to arrive, the Defendant went out to his truck and retrieved a shotgun and a white bag. Inside the bag was a box of latex gloves. The Defendant placed the bag and the gloves on the top of the refrigerator. The victim then entered the house and asked Anderson, "Do you want to buy some dope?" According to Anderson, the Defendant then jumped up from the table and hit the victim in the head with the butt of the shotgun, rendering the victim unconscious. As soon as the victim fell to the floor, Nunley put on a pair of gloves and began wrapping duct tape around the victim's head. The Defendant also put on gloves. They taped the victim's head "completely up," also taping his hands and feet. When the victim started to come to, he was unable to breathe and began "flopping around just like a fish dying...." The victim soon ceased moving.

The Defendant then removed a gold necklace from around the victim's neck. The Defendant went outside to the victim's truck; meanwhile, Nunley was cleaning up blood on the floor. Thereafter, they carried the victim to a bedroom window and pushed him out the window into the bed of the victim's truck. Nunley handed the Defendant a sheet, which he wrapped around the victim. The men then left the house; Nunley driving the victim's truck, and the Defendant driving his truck with Anderson as a passenger. They drove to Old Hickory Boulevard near Blueberry Hill and left the truck on the side of the road. The Defendant took the victim's compact disc case out of his truck. Nunley got into the Defendant's vehicle, and they returned to the Defendant's girlfriend's house. The Defendant and Anderson showered, and the Defendant collected their clothes. Nunley then left after receiving his share of the cocaine; the Defendant took Anderson back to Anderson's

place. The next day, the Defendant gave Anderson cocaine and money and rented Anderson a room in a local motel. Anderson later told Stokes about the murder.

In September 2007, the Defendant and Anderson were being transported on a bus together. Anderson was in protective custody, separated from the Defendant by a cage. The Defendant yelled threats at Anderson, warning him not to testify against him. Inmate Timothy Flener was present on the bus and heard these threats. He was also placed in a cell with the Defendant following the bus ride, and the Defendant told Flener that he and Anderson were involved in a murder together.

The Defendant's wife and former girlfriend in July 2001, Tammi Renee Battle, was shown a box of gloves. She confirmed that the box in the photograph was the same type of gloves that she had brought home from work.
Medical Examiner Dr. Thomas Deering testified as to the victim's cause of the death. He also stated that, when a person was losing the ability to breathe, they might start thrashing around.

A check of Nunley's phone records showed that Nunley phoned the victim on the day of his murder. The victim's phone records revealed that the victim had phoned Nunley several times the evening he was murdered.

Jafton Richardson, an inmate serving a sentence for practicing law without a license, testified that, while incarcerated, the Defendant told him he was involved in a homicide at Nunley's house. The Defendant relayed that there was a phone call to the victim, and he was to meet with them at the house for a drug deal. However, they intended to rob him of his drugs and weapons, but instead the victim was hit in the head with the butt of a shotgun and died. The Defendant also stated that he wore gloves during the robbery and that he got the gloves from his wife who worked at a hospital. According to Richardson, the Defendant's attitude about the murder was "nonchalant."

Later, the Defendant came to Richardson in jail and asked him to sign an affidavit that the Defendant had never spoken to him about the murder. Richardson complied because he feared for the safety of his family.

The Defendant testified on his own behalf, asserting that he had no involvement in the murder of the victim. He denied that he ever knew the victim, asserted that he never sold drugs, and claimed that he never owned a shotgun.

Following the conclusion of the proof, the jury found the Defendant guilty as charged. The trial court merged the felony murder and premeditated murder counts. The Defendant was sentenced to life imprisonment for the murder plus sixty years for especially aggravated robbery.

*State v. Johnson*, 2010 WL 521028, at **1-3.

### B.   Post-Conviction Proceedings

The Tennessee Court of Criminal Appeals summarized the proof adduced at the petitioner's post-conviction evidentiary hearing as follows:

> At the post-conviction hearing, the Petitioner testified that Counsel represented him from 2005 to 2008. He described their communication during this time period as "not much." The Petitioner was housed at the Turney Center at the time, approximately an hour's drive from Nashville. He recalled that Counsel twice met with him at Charles Bass Correctional Complex, the first time being when he was first charged and, once again, right before trial. The Petitioner also met with Counsel at approximately thirty-five court hearings, and during four or five phone calls that were five to ten minutes each in length.

> The Petitioner testified that he received a copy of the indictment and "most of the discovery." The Petitioner reviewed the discovery but stated that he and Counsel never discussed the contents of the discovery. He stated that their conversations at court mostly centered around the motion that was the focus of that court date. The Petitioner agreed that he asked Counsel questions about the evidence against him and that Counsel responded to "the best of his knowledge." Several of the witnesses that were to testify against the Petitioner were either co-defendants or persons with pending criminal charges. Counsel told the Petitioner that these witnesses' testimony "shouldn't hold up" because the witnesses were convicted felons. The Petitioner testified that Counsel never discussed strategies for impeaching these witnesses. He recalled Counsel telling the Petitioner that his charges "shouldn't stick."

> The Petitioner testified that Counsel relayed the State's offer of a thirty-five year sentence to settle his case. Counsel warned the Petitioner that he could be facing more time if convicted at trial, but the Petitioner declined the State's offer. When asked whether he made a counter-offer, the Petitioner stated that it "[w]asn't up for option" because it "never came up."

> The Petitioner testified that Counsel explained to him that he faced a life sentence if he was convicted at trial. He said that Counsel did not explain the stages of trial or "how it work[ed]." The Petitioner confirmed that Counsel reviewed with him his right to call and cross-examine witnesses. Counsel explained that the Petitioner had the right to testify but advised against it. The Petitioner elected to testify at trial anyway.

> The Petitioner testified that Counsel failed to interview any of the State's witnesses. He stated that his wife, Tammi Renee Battle, was forced to testify at trial despite the fact that the two were married. The Petitioner said that Counsel never discussed marital privilege with him either before or during the trial and that he only learned of it after he was convicted. He recalled that Counsel objected to Ms. Battle

testifying at trial, but he was unaware of the legal basis for the objection. Counsel met with Ms. Battle before trial and was aware that Ms. Battle would confirm her statement to police that there was a gun and gloves in the Defendant's house. Despite knowing that Ms. Battle's testimony would benefit the State, Counsel never discussed ways to exclude this testimony from the trial.

The Petitioner testified that Counsel notified him that Jafton Richardson, a fellow inmate, would testify at trial; however, Counsel never spoke with Mr. Richardson in preparation for trial. Further, Counsel never discussed possible ways to exclude Mr. Richardson's testimony at trial. The Petitioner recalled that a co-defendant, Mr. Anderson, also testified against him at trial. Counsel never discussed with the Petitioner the need for corroboration as to his co-defendant's testimony. The Petitioner reiterated that Counsel should have interviewed the State's witnesses prior to trial but he failed to do so. The Petitioner also believed that Counsel might have learned information with which Counsel could have impeached the State's witnesses at trial.

The Petitioner testified that he was also represented by appellate counsel. On appeal, the only two issues raised were sufficiency of the evidence and a challenge to hearsay evidence.

On cross-examination, the Petitioner agreed that, prior to the trial, he had been convicted of other crimes. He pleaded guilty in one of the cases and the other went to trial. The Petitioner agreed that Counsel hired an investigator, Patrick Wells. The Petitioner only met with the investigator on one occasion. As to interviewing other witnesses, the Petitioner stated that the investigator only spoke with the Petitioner's wife and did not interview the other trial witnesses.

Upon further questioning by the post-conviction court, the Petitioner testified that, at the time of the 2001 homicide in this case, he and his wife lived together. In 2002, the Petitioner was incarcerated and, therefore, he and his wife could no longer live together and were separated. The Petitioner confirmed that he and his wife were still married at the time of the post-conviction hearing.

Counsel testified that when he received discovery in the Petitioner's case, he made copies for the Petitioner. After he was appointed as the Petitioner's attorney, he successfully sought funding to hire an investigator, Mr. Wells. Counsel also provided Mr. Wells with a copy of the discovery. Counsel stated that he met with the Petitioner "several times" but did not know the exact number. He also acknowledged that they were in court "a bunch."

Counsel testified that he provided Mr. Wells with a list of the State's witnesses, and Mr. Wells "talked to everybody that I needed him to talk to," although there were some witnesses who refused to talk with Mr. Wells. Counsel said that Mr. Wells spoke with the Petitioner's wife and that the Petitioner's co-defendants Mr. Nunley and Mr. Anderson were both represented by attorneys. Counsel recalled that Mr.

Wells had an initial conversation with Mr. Richardson, "but that kind of broke down." Counsel could not remember if Mr. Wells made contact with Mr. Stokes. Counsel said that Mr. Wells prepared reports summarizing his interviews and that those reports would have been provided to the Petitioner. Mr. Wells did not create a report if a witness declined to speak with him. Counsel stated that he was unaware of any witnesses that might have been favorable to the defense.

Counsel testified that normally he would make a counter-offer if a defendant declined the State's offer to settle a case. In this case, the Petitioner never expressed any interest in settling the case. Counsel said that the Petitioner's position was that he was not at the scene of the crime; thus, the negotiation process was "curtailed."

Counsel testified that the Petitioner expressed concern over how some of the State's witnesses could testify in light of their criminal records. Counsel said that he told the Petitioner that absent a viable suppression issue, the witnesses' criminal records were a credibility issue at trial. Counsel said that, through cross-examination, he tried to illicit responses that showed "they're getting help from the State" or challenge the witness's credibility, as he did based on Mr. Anderson's and Mr. Richardson's numerous felonies.

Counsel testified that the Petitioner expressed concern about Mr. Richardson testifying because Mr. Richardson had been involved in some altercations in prison and placed in segregation because of his involvement working with law enforcement. Counsel described the source of this information as "chatter" or "scuttlebutt" and that it was not "official." He was unable to confirm this information through his investigator. Thus, Counsel could not make an argument that Mr. Richardson was "acting as an agent of the State" without confirmation of the information.

Counsel testified that he did not "do any research on" privileged communication between marriage partners. Counsel confirmed that Ms. Battle, the Petitioner's wife, did not want to testify at trial.

On cross-examination, Counsel testified that he had been a defense attorney for sixteen years and 90% of his practice involved criminal law. Counsel stated that he had represented thirty clients in homicide cases and of those he had tried four. Counsel agreed that he normally employed a defense investigator on cases and normally worked with Mr. Wells. Counsel said he told the Petitioner that Mr. Wells would be talking with all of the witnesses allowing Counsel to restrict his contact with potential witnesses. Counsel explained that this was his practice in criminal cases because if a witness said something substantive, he could call Mr. Wells as a witness at trial to impeach another witness's testimony. As to potential witnesses who are represented by an attorney, Counsel normally contacted the attorney first to gain permission. Counsel testified that approximately 70% of the time, the witnesses declined to speak with his investigator.

Counsel testified that, at trial, the questioning of Ms. Battle was limited to information that was within Ms. Battle's personal knowledge and not about conversations with the Petitioner.

Appellate Counsel testified that he had practiced law for over twenty years and 30–40% of his work was criminal appellate issues. Appellate Counsel assisted the Petitioner in filing his direct appeal and his application for permission to appeal to the Supreme Court. Most of Appellate Counsel's interaction with the Petitioner was through phone calls and letters. It was Appellate Counsel's impression that the Petitioner understood the process and Appellate Counsel's approach to the appeal.

Appellate Counsel testified that he pursued a mistrial issue and a 404(b) issue on appeal. Based upon the weight of the evidence, he did not believe there was a strong sufficiency of the evidence argument for the appeal. Because Appellate Counsel did not believe it was a legitimate issue on appeal, he did not include it.

Appellate Counsel said that he spoke with Counsel about the case prior to preparing the Petitioner's direct appeal brief. Appellate Counsel had no independent recollection of his discussion with Counsel.

After hearing the proof and the parties' arguments, the post-conviction court issued an order denying relief.

*Johnson*, 2017 WL 1427254, at **3-5.

## III.    Standard of Review

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (internal citations and quotation marks omitted). As the Supreme Court explained, the AEDPA "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. 12, 19 (2013).  The AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id.*

One of the AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in 28 U.S .C. § 2254(d). Under the AEDPA, the court may grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

The state court's factual findings are presumed to be correct, and they can be contravened only if the petitioner can show by clear and convincing evidence that the state court's factual findings were erroneous. 28 U.S.C. § 2254(e)(1). State-court factual findings are "only unreasonable where they are 'rebutted by clear and convincing evidence' and do not have support in the record." *Moritz v. Woo*ds, 692 Fed. App'x 249, 254 (6th Cir. 2017) (quoting *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017) (internal quotation marks omitted)). As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). Review under § 2254(d) (1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011).

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29

(2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Id.* (citation omitted); *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996) (the substance of the claim must have been presented as a federal constitutional claim). This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509, 522 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *See Picard v. Connor*, 404 U.S. 270, 275 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review").

Claims which are not exhausted are procedurally defaulted and "ordinarily may not be considered by a federal court on habeas review." *Alley v. Bell*, 307 F.3d 380, 388 (6th Cir. 2002). Procedural default also occurs where the state court "actually . . . relie[s] on [a state] procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985). To cause a procedural default, the state court's ruling must "rest[ ] on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman*, 501 U.S. at 729.

"In order to gain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate cause and prejudice for the failure, or that a miscarriage of justice will result from the lack of review." *Alley,* 307 F.3d at 386. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman v. Thompson*, 501 U.S. 722, 754 (1991)). A petitioner may establish cause by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply

with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. *Id.* Constitutionally ineffective assistance of trial or appellate counsel may constitute cause. *Murray*, 477 U.S. at 488–89. Generally, however, if a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself have been presented to the state courts as an independent claim before it may be used to establish cause. *Id.* If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim. *Edwards v. Carpenter*, 529 U.S. 446, 452–53 (2000).

Petitioners in Tennessee also can establish "cause" to excuse the procedural default of a substantial claim of ineffective assistance by demonstrating the ineffective assistance of post-conviction counsel in failing to raise the claim in initial review post-conviction proceedings. *See Martinez v. Ryan*, 566 U.S. 1, 5-6 (2012) (creating an exception to *Coleman* where state law prohibits ineffective assistance claims on direct appeal); *Trevino v. Thaler*, 569 U.S. 413, 429 (2013) (extending *Martinez* to states with procedural frameworks that make meaningful opportunity to raise ineffective assistance claim on direct appeal unlikely); *Sutton v. Carpenter*, 745 F.3d 787, 792 (6th Cir. 2014) (holding that *Martinez* and *Trevino* apply in Tennessee). The Supreme Court's creation in *Martinez* of a narrow exception to the procedural default bar stemmed from the recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Martinez*, 566 U.S. at 13. In other words, *Martinez* requires that the ineffective assistance of post-conviction counsel occur during

the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of-trial-counsel claim [be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *See id*. at 13-15.  Importantly, *Martinez* did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in *Coleman*.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his <u>actual</u> and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court also has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392  (2004) (citing *Murray*, 477 U.S. at 496).

## IV.     Analysis

With these principles in mind, the court will turn to the examination of the claims raised in Johnson's petition for habeas relief.

### A.     Petitioner's Claim that Trial Court Erred By Denying a Mistrial

The petitioner alleges that the trial court should have granted the petitioner's motion for a mistrial or declared a mistrial sua sponte after the victim's mother, Patricia Ann Eutsey, fainted during the petitioner's trial.  (Doc. No. 1 at 16-20).

In order to qualify as exhausted, this claim must have been presented to the state's highest court, *Hafley v. Sowders*, 902 F .2d 480, 483 (6th Cir. 1990), and must have been presented in a form which allows the state court a full and fair opportunity to rule on the claim. *Justices of Boston Mun. Court v. Lydon*, 466 U.S. 294, 302-303 (1984); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). A prisoner exhausts a claim by "fairly present[ing]" it to the appropriate trial and appellate courts. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). "A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented: (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law." *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003) (internal quotation marks omitted), *abrogated on other grounds by English v. Berghui*s, 529 Fed. App'x 734 (6th Cir. 2013). "General allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present' claims that specific constitutional rights were violated." *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) (citation omitted).

Because relief under § 2254 can only be based upon a violation of the United States Constitution or law or treaties of the United States, the claim must have been presented as an issue of federal constitutional law, not state law. *See Anderson v. Harless*, 459 U.S. 4, 6-7 (1982) ("It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made.") (internal citations omitted). Error in the application of state law is not cognizable in a federal habeas proceeding. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court

may not issue the writ on the basis of a perceived error of state law."). The respondent argues that the petitioner failed to exhaust this claim as a federal claim in the state court proceedings because he failed to present this claim as one of federal constitutional law. (Doc. No. 13 at 14-15).

On direct appeal to the Tennessee Court of Criminal Appeals, the petitioner argued that, although the trial court gave a curative instruction, the instruction did not eliminate the prejudice caused by the victim's mother fainting in open court; therefore, the trial court should have declared a mistrial. (Doc. No. 12, Attach. 10 at 22-27). In support of his argument, the petitioner relied on both state and federal law. (*See id.*) While the Tennessee Court of Criminals Appeals did not rely on any federal cases or Tennessee cases using a federal constitutional analysis to analyze the petitioner's claim, *Johnson*, 2010 WL 521028, at *5, the court finds that the petitioner fairly presented this claim as a federal and state claim to the state's highest court. Therefore, this claim is exhausted and appropriately before this court for AEDPA review.

The Tennessee Court of Criminal Appeals began its analysis of this claim by setting forth the applicable law:

> In a criminal trial, a mistrial should only be declared "in the event of a 'manifest necessity' that requires such action." *State v. Reid*, 164 S.W.3d 286, 341 (Tenn. 2005) (quoting *State v. Hall*, 976 S.W.2d 121, 147 (Tenn.1998)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App.1996). An abstract formula should not be applied mechanically in determining whether a mistrial was necessary, and all relevant circumstances should be taken into account. *State v. Mounce*, 859 S.W.2d 319, 322 (Tenn.1993). Whether a mistrial should be granted is a determination left to the sound discretion of the trial court. *Reid*, 164 S.W.3d at 342 (citing *State v. Smith*, 871 S.W.2d 667, 672 (Tenn.1994)). The trial court's decision should not be overturned absent an abuse of discretion. *Id*. Additionally, the party arguing that a mistrial should have been granted bears the burden of establishing its necessity. *Id*. (citing *Williams*, 929 S.W.2d at 388).

*Johnson*, 2010 WL 521028, at *5. The court then applied the law to the facts of the case:

In the present case, no one could have predicted that the victim's mother would faint when she did. While unfortunate, there is, however, no indication that the victim's mother or the State orchestrated this action for the jury's benefit. Moreover, the trial court gave a prompt curative instruction. The court admonished the jury to render its verdict on the basis of the testimony and instructions and to put aside prejudice, sympathy, and the like. The jury is presumed to follow the instructions of the court. *See State v. Banks*, 271 S.W.3d 90, 134 (Tenn. 2008) (citations omitted). Based on our review and under these circumstances, we conclude that it was not an abuse of discretion for the trial court to deny the Defendant's request for a mistrial following the victim's mother's collapse in the jury's presence. *See generally State v. Adkins*, 786 S.W.2d 642, 644 (Tenn.1990) (holding that a mistrial was not required following a witness's outburst where the trial court took immediate action to dispel prejudice); *State v. Terrence McCray*, No. W2005-00479-CCA-R3-CD, 2006 WL 2567483, at *6-8 (Tenn. Crim. App., Jackson, Sept. 5, 2006) (no error occurred where the trial court denied a request for a mistrial after an emotional display by the victim's aunt, who had fallen on the floor; the jury was led from the courtroom and, upon their return, a curative instruction was given); *State v. James Cleveland Breer*, No. W2001-00390-CCA-R3-CD, 2002 WL 1482796, at *11-12 (Tenn. Crim. App., Jackson, Feb. 7, 2002) (holding that the trial court did not abuse its discretion in refusing to grant a mistrial after an emotional outburst by the victim's grandmother).

The Defendant is not entitled to relief on this issue.

*Johnson*, 2010 WL 521028, at *5 (footnote omitted).

"The scope of habeas review of a state court's refusal to declare a mistrial is very limited."

*Sanders v. Ford*, 2017 WL 3888492, at *11 (M.D. Tenn. Sept. 6, 2017). As the United States

Supreme Court has explained:

That question is not whether the trial judge should have declared a mistrial. It is not even whether it was an abuse of discretion for her to have done so—the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application . . . of clearly established Federal law." § 2254(d)(1)).

*Renico v. Lett*, 559 U.S. 766, 772-72 (2010). "The decision whether to grant a mistrial is reserved

to the 'broad discretion' of the trial judge, a point that 'has been consistently reiterated in decisions

of'" the Supreme Court. *Renico*, 559 U.S. at 774 (quoting *Illinois v. Somerville*, 410 U.S. 458,

462 (1973)).

In reviewing the trial court's decision not to declare a mistrial, the Tennessee Court of Criminal Appeals found that no one could have predicted that Ms. Eutsey would faint and there was no indication that Ms. Eutsey or the State had orchestrated the event to elicit sympathy from the jury. When the jury returned to the courtroom, the trial court informed the jury that Ms. Eutsey appeared to be feeling better and that she would recover. (Doc. No. 12, Attach. 6 at 66-67). The trial court instructed the jury, "It is very important that you not allow what occurred to influence the way you are looking at things in any manner, whatsoever." (*Id*. at 67. The court acknowledged that the medical issue may have surprised some people and "caused some emotions," but cautioned the jury that it could not let such reactions "influence the way you are hearing the testimony of Dr. Deering or for any other reason in this trial." (*Id*.) The court advised the jury that it would provide an update before the end of the day on Ms. Eutsey's condition. (*Id*.) The State then resumed questioning Dr. Deering. (*Id*.) Later in the day, the trial court informed the jury that Ms. Eutsey "received a clean bill of health," and she had no need to go to the hospital. (*Id*. at 122).

When court resumed the next morning, trial counsel moved for a mistrial. (*Id*. at 131-32). The court denied the motion and made additional findings about the medical incident. (*Id*. at 133-35). The court found that the jury did not appear to have "a vendetta for anyone as a result of the incident involving Ms. Eutsey." (*Id*. at 134). The court found that any concern on the part of the jury was simply for the well-being of Ms. Eutsey and how the incident might affect her perceptions of the trial. (*Id*.) The judge provided the jury with a curative instruction, admonishing the jury to render its verdict on the basis of the testimony and instructions and to put aside sympathy and the like. The trial judge noted that he had closely observed the jury as he provided the curative instruction. (*Id*.) The reaction of the jurors ("all of them were nodding") gave the judge the impression "that they fully understood" the incident could not affect the way in which they viewed

the evidence or decided the case. (*Id.*) The court ruled that it would again instruct the jury in the final charge "that they cannot allow their sympathies or prejudices or anything else to interfere with the requirement that they have as jurors, and that is to render a verdict based on the law that they are provided and the evidence that they will hear during the course of the trial." (*Id.* at 134-35). The appellate court noted that the jury is presumed to follow the instructions of the trial court, *see Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions."), and concluded that the trial court did not abuse its discretion by denying the mistrial under these circumstances.

In light of the trial court's broad discretion and the facts of this case, the state court's determination that the trial court did not abuse its discretion in denying the petitioner's motion for mistrial was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence before the state court. The petitioner is not entitled to relief on this claim.

### B.  Petitioner's Claim that Trial Court Erred in Admitting Evidence that Petitioner Was a Drug Dealer

Next, the petitioner alleges that the trial court erred when it allowed accomplices Alvin Stokes and Paul Anderson to testify that the petitioner was a drug dealer because the testimony was inadmissible under Tennessee Rules of Evidence 403 and/or 404(b). (Doc. No. 1 at 21-22).

In order to qualify as exhausted, the claim must have been presented to the state's highest court, *Hafley v. Sowders*, 902 F .2d 480, 483 (6th Cir. 1990), and must have been presented in a form which allows the state court a full and fair opportunity to rule on the claim. *Justices of Boston Mun. Court v. Lydon*, 466 U.S. 294, 302-303 (1984); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). A claim may only be considered "fairly presented" if the petitioner asserted both a factual and legal basis for his claim in state court. *McMeans v. Brigano*, 228 F.3d 674, 681 (6th

Cir. 2000). Because relief under § 2254 can only be based upon a violation of the United States Constitution or law or treaties of the United States, the claim must have been presented as an issue of federal constitutional law, not state law. *See Anderson v. Harless*, 459 U.S. 4, 6-7 (1982) ("It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made.") (internal citations omitted). The petitioner must have presented his claim in the state court "as a federal constitutional issue-not merely as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).

Here, the petitioner failed to exhaust this claim as a federal claim in the state court proceedings because he failed to present this claim as one of federal constitutional law. On direct appeal to the Tennessee Court of Criminal Appeals, the petitioner argued that "[t]he trial court erred in allowing accomplice testimony related to other bad acts in violation of Tenn. R. Evid. 403 and/or 404(b)." (Doc. No. 12, Attach. 10 at 28). In support of his argument, the petitioner cited only state law, including the Tennessee Rules of Evidence and Tennessee case law. (*Id*. at 28-29). The petitioner failed to cite any federal case law employing a constitutional analysis with respect to the pertinent federal right alleged and failed to present his federal constitutional claim in a manner that fairly alerted the state court to the federal nature of his claim.

By failing to present the federal constitutional claim alleged in the instant petition to the state courts, the petitioner committed a procedural default. He, therefore, has waived his claim for purposes of federal habeas corpus review unless he establishes cause for the default and actual prejudice as a result of the alleged errors. There is nothing in the record which indicates that the petitioner can satisfy either the cause and prejudice requirement or make a showing of a fundamental miscarriage of justice. Therefore, the petitioner is not entitled to relief. The claim will be dismissed.

**C.**      **Ineffective Assistance of Counsel Claims**

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right of a person accused of a crime to the effective assistance of counsel.   To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant.   *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Bell v. Cone*, 535 U.S. 685, 694-95 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 686-87; *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000), *cert. denied*, 531 U.S. 1035 (2000).   In assessing performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91.   Reasonable attorneys may disagree on the appropriate strategy for defending a client. *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004).   The prejudice element requires a petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

A court hearing an ineffective assistance of counsel claim must consider the totality of the evidence. *Strickland*, 466 U.S. at 695.   "The determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'" *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (quoting *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (en banc)).   "Judicial scrutiny of counsel's performance must be highly deferential.   It is all too tempting for a defendant to second-guess counsel's

assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689.

As discussed above, federal habeas relief may not be granted under 28 U.S.C. § 2254 unless the petitioner shows that the earlier state court's decision "was contrary to" federal law then clearly established in the holding of the United States Supreme Court, § 2254(d)(1); that it "involved an unreasonable application of" such law; or that it "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(1),(2). Thus, when a claim of ineffective assistance of counsel is raised in a federal habeas petition, such as here, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). As the Supreme Court clarified in *Harrington*:

> This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington*, 562 U.S. at 101 (internal quotation marks and citation omitted).

### 1. Trial counsel failed to exclude the testimony of the petitioner's wife at trial as marital communication

In his first sub-claim of ineffective assistance of counsel, the petitioner claims that his trial attorney was constitutionally ineffective because he failed to argue effectively that the petitioner's wife's testimony was inadmissible due to the marital privilege. (Doc. No. 1 at 23-28). At issue is

the testimony of Ms. Battle at trial, who testified she had boxes of gloves in the home she shared with the petitioner in July 2001 and that he had a shotgun in the home. (Doc. No. 12, Attach. 4 at 546, 548, 549-50).

The respondent concedes that the petitioner exhausted this claim and contends that the state court's adjudication on this issue was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence before the state court. (Doc. No. 13 at 23-24).

The petitioner alleged in his post-conviction petition and on appeal of the denial of his petition that trial counsel's performance was deficient because he failed to "effectively argue that the testimony of Mr. Johnson's wife should have been inadmissible due to the marital privilege." (Doc. No. 12, Attach. 30 at 26-31). According to the petitioner, "[i]f his counsel had argued that all communications, rather than merely oral communications, were covered under the privilege, the trial court should have excluded the testimony of Ms. Battle." (*Id*. at 31). In evaluating this claim, the Tennessee Court of Criminal Appeals set forth the proper legal standard for claims of ineffective assistance of counsel. *See Johnson*, 2017 WL 1427254, at **6-7. Applying *Strickland*, the appellate court concluded that the evidence in the record supported the post-conviction court's conclusion that lead trial counsel's performance was not deficient, finding as follows:

> In the present appeal, in asserting that the marital privilege should be applied and that Counsel was ineffective for failing to raise it, the Petitioner established only that he and the witness were married after the criminal event. Even assuming that Ms. Battle's statements were determined to be communication between the parties, no showing was made that the statement "originated in a confidence," that it would not be disclosed, or that it was not made within the earshot of others. Likewise, there is no proof to establish the existence of factors (B), (C), and (D). The record indicates that Ms. Battle and the Petitioner were not speaking to one another by the time of trial and that the Petitioner was seeking a divorce. Thus, it is unclear how the Petitioner can assert that the statement should be kept confidential for "the full and satisfactory maintenance of the relation between the parties" and that his tenuous relationship with his wife "ought to be sedulously fostered."

Accordingly, we conclude that the record supports the post-conviction court's determination that the Petitioner failed to establish that the marital privilege applied to the statement. The record also supports the post-conviction court's finding that Counsel was not ineffective for failing to further challenge the testimony on this basis after his objection was overruled. Likewise, we conclude that the Petitioner has failed to show that Appellate Counsel was ineffective for not pursuing this issue on direct appeal. The Petitioner is not entitled to relief as to this issue.

*Johnson*, 2017 WL 1427254, at *8.

Tennessee's marital communication privilege is codified at Tennessee Code Annotated section 24–1–201(c)(1) (2009), which provides:

(1) In a criminal proceeding a marital confidential communication shall be privileged if:

(A) The communications originated in a confidence that they will not be disclosed;

(B) The element of confidentiality is essential to the full and satisfactory maintenance of the relation between the parties;

(C) The relation must be one which, in the opinion of the community, ought to be sedulously fostered; and

(D) The injury to the relation by disclosure of the communications outweighs the benefit gained for the correct disposal of litigation.

*Id.* A trial court must find all four factors applicable before permitting a spouse to invoke the marital communication privilege. *State v. Mitchell*, 137 S.W.3d 630, 638 (Tenn. Crim. App. 2003).

Rubber gloves and a shotgun were used in the commission of the crimes for which the petitioner was convicted. During the petitioner's trial, Ms. Battle testified that, when she and the petitioner were cohabitating and married in 2001, he kept a shotgun in their home and that there were rubber gloves in the home that she brought home from her place of employment. (Doc. No 12, Attach 4. at 63, 65-67). The petitioner maintains now and

has maintained throughout his legal proceedings that Ms. Battle bringing home gloves and the petitioner owning a shotgun constituted confidential "communications" between the parties subject to marital privilege.

However, the crime occurred in July 2001 and the petitioner and Ms. Battle were not married until October 2001. Thus, even if the acts of bringing home gloves and owning a shotgun constituted "communications" between the petitioner and Ms. Battle, under subsection (A), which evaluates the nature of the relationship at the time of the communication, the petitioner cannot show that the statement "originated in a confidence." As the post-conviction court stated, "[a] marital confidence cannot exist when the marriage doesn't yet exist." *Johnson*, 2017 WL 1427254, at *7. Moreover, the petitioner cannot prove subsection (B) because the record established that Ms. Battle and the petitioner were not speaking to one another by the time of the trial and the petitioner was seeking a divorce. Consequently, the petitioner cannot effectively demonstrate that the communications, if they were communications at all, should have been kept confidential for "the full and satisfactory maintenance of the relation between the parties" and that his relationship with Ms. Battle "ought to be sedulously fostered." Tenn. Code Ann. § 24-1-201(c)(1)(C).

The court finds that the petitioner has not shown that he is entitled to relief on this claim because the appellate court's determination was not contrary to *Strickland*. Neither was the appellate court's ineffective assistance determination based on an unreasonable determination of the facts or an unreasonable applicable of *Strickland's* standards to those facts. Further, the state court's determinations are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary, *see* 28 U.S.C. § 2254(e)(1), which the petitioner has not submitted. Because the marital privilege did not apply to the

communications, trial counsel could not have been ineffective in failing to convince the court to apply the privilege or in failing to further challenge the testimony on this basis after the trial court overruled his objection. This ineffective assistance of counsel claim is without merit and will be dismissed.

### 2. Trial counsel's failure to file a motion to suppress the petitioner's statement to Jaffton Richardson

Next, the petitioner alleges that trial counsel was ineffective by failing to file a motion to suppress the petitioner's statement to Jaffton Richardson because, at the time the petitioner gave the statement, Mr. Richardson was acting as an agent of law enforcement. (Doc. No. 1 at 28-30).

The post-conviction court rejected this claim because, other than the testimony from the petitioner and his counsel, there was no evidence that Mr. Richardson was involved with the police in any way. *Johnson v. State*, 2017 WL 1427254, at *9. Counsel testified at the petitioner's post-conviction hearing that counsel explored the state agent theory, did not find evidence to support it and, as a result, did not pursue the theory further. *Id*. The post-conviction court found that counsel's decision was a reasonable strategic decision. *Id*. Additionally, the post-conviction court found that there was no evidence to support that the motion to suppress would have been granted if filed; therefore, "no prejudice could attach to the failure to file the motion since it would not have any effect on the ultimate outcome of the trial." *Id*.

In reviewing the post-conviction court's rejection of the petitioner's ineffective assistance claim, the Tennessee Court of Criminal Appeals held:

> There is no evidence in the record that Mr. Richardson was a government agent or that Mr. Richardson deliberately elicited the relevant information from the Petitioner. Counsel testified that he was unable to confirm this information, referencing it as "chatter," and thus he had no basis upon which to file a suppression motion. Without a legal basis for a motion to suppress, we cannot conclude that Counsel was ineffective for not filing such a motion. Likewise, we do not conclude

that Appellate Counsel was ineffective for excluding this issue on appeal. The Petitioner is not entitled to relief.

*Johnson*, 2017 WL 1427254, at *9.

The Fifth and Sixth Amendment rights to counsel not only apply to direct confrontations by known government officers but also to "indirect and surreptitious interrogations" by covert government agents and informants. *United States v. Henry*, 447 U.S. 264, 273 (1980). In order for a Fifth or Sixth Amendment violation to occur, the right to counsel must have been invoked or attached at the time of the violation, the informant must have been acting as a government agent, the informant must have deliberately elicited incriminating information from the defendant, and the defendant must not have waived his right to counsel as to those statements. *State v. Willis*, 496 S.W.3d 653, 706-16 (Tenn. 2016).

Here, there is no evidence in the record that Mr. Richardson was, in fact, a government agent or that he deliberately elicited the relevant information from the petitioner. (Doc. No. 12, Attach. 26 at 76). Counsel testified at the post-conviction hearing that he sent his private investigator to investigate the possibility that Mr. Richardson may have been acting as an informant for law enforcement in cases other than the petitioner's case, but the investigator did not find any such evidence. (*Id*. at 75-76). The private investigator heard "some chatter" and "some scuttlebutt" about Mr. Richardson's involvement in other cases, but his investigation did not yield anything concrete to support these beliefs. (*Id*. at 76). Without proof that Mr. Anderson was a government agent, the state courts reasonably concluded that trial counsel acted reasonably in opting not to pursue the motion to suppress his testimony. Trial counsel cannot be ineffective for failing to file a frivolous motion. *See Holmes v. United States*, 281 Fed. App'x 475, 482 (6th Cir. 2008).

The court finds that the petitioner has not shown that he is entitled to relief on this claim because the appellate court's determination was not contrary to *Strickland*. Neither was the appellate court's ineffective assistance determination based on an unreasonable determination of the facts or an unreasonable applicable of *Strickland's* standards to those facts. Further, the state court's determinations are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary, *see* 28 U.S.C. § 2254(e)(1), which the petitioner has not submitted. This ineffective assistance of counsel claim is without merit and will be dismissed.

### 3. Trial counsel's failure to argue that the testimony of Paul Anderson was the uncorroborated testimony of a co-conspirator

The petitioner alleges that trial counsel provided ineffective assistance by failing to argue that the testimony of Paul Anderson was the uncorroborated testimony of a co-conspirator. (Doc. No. 1 at 31-32). At trial, Mr. Anderson testified that he had no involvement in the murder of the victim, denied that he ever knew the victim, asserted that he never sold drugs, and claimed that he never owned a shotgun. *Johnson*, 2010 WL 521028, at **2-3. The petitioner claims that the trial court should have excluded the testimony of Ms. Battle, Mr. Richardson, and Alvin Stokes because, in doing so, the court would have eliminated the corroborating evidence of Anderson's testimony. (*Id*. at 32).

In considering this claim on appeal of the denial of post-conviction relief, the Tennessee Court of Criminal Appeals found that the petitioner had failed to prove that Ms. Battle's or Mr. Richardson's testimony would have been excluded at trial. *Johnson*, 2017 WL 1427254, at *9. The court further concluded that Mr. Anderson's testimony was corroborated by other evidence adduced at trial. *Id*. As a result, the court held that the petitioner had not shown that counsel was ineffective for failing to challenge Mr. Anderson's testimony as an indicted co-conspirator. *Id*.

The trial evidence showed that, unlike Christopher Nunley, neither Ms. Battle nor Mr. Richardson was involved in the murder of the victim. Because Ms. Battle and Mr. Richardson were not accomplices or co-conspirators, their testimony was not inadmissible as uncorroborated accomplice testimony or uncorroborated testimony of a co-conspirator. Mr. Stokes explained on the witness stand that he was testifying in order to receive favorable treatment in an unrelated drug case. (Doc. No. 12, Attach. 4 at 154-163). In assessing Mr. Stokes's credibility, the jury must have found him credible, even considering the motives for his testimony. *See United States v. Bond*, 22 F.3d 662, 667 (6th Cir. 1994) ("The credibility of witnesses is exclusively the province of the jury.").

Significant evidence corroborated Mr. Anderson's testimony. Mr. Anderson testified that Mr. Nunley called the victim to arrange the fake drug deal. (Doc. No. 12. Attach. 5 at 714). Mr. Nunley's telephone records confirmed that he called the victim on the day of the murder, and the victim's phone records showed that the victim called Mr. Nunley several times on the evening of the murder. (Doc. No. 12, Attach. 8 at 127-44). The autopsy report and testimony of Dr. Deering corroborated Mr. Anderson's testimony that the victim had been smashed in the face with a shotgun, that his face and nose had been duct taped, and that his face, hands, and feet had been covered with a plastic bag. (Doc. No. 12, Attach. 5 at 179-80; Attach. 8 at 190). Dr. Deering testified that the victim had injuries to his face that were consistent with blunt force trauma from an object such as a long gun, and he said this injury could be sufficient to render the victim unconscious. (Doc. No. No. 12, Attach. 6 at 59-65). The autopsy report showed that the victim's cause of death was blunt force trauma and asphyxia. (Doc. No. 12, Attach. 8 at 190). Timothy Flener testified that the petitioner told him that the petitioner and Mr. Anderson participated in a

"crime together and that there was a gun involved in it and somebody was killed and that he had the gun." (Doc. No. 12, Attach. 5 at 168-69).

Based on this corroborating evidence (the police investigation of the crime scene, Mr. Nunley's phone records, the autopsy report, and Mr. Flener's testimony), had counsel objected to Mr. Anderson's testimony on grounds that it was the uncorroborated testimony of a co-conspirator, the objection would have been overruled. Trial counsel cannot be ineffective for failing to raise a meritless objection. *See Holmes*, 281 F. App'x at 482. The court finds that the petitioner has not shown that he is entitled to relief on this claim because the appellate court's determination was not contrary to *Strickland*. Neither was the appellate court's ineffective assistance determination based on an unreasonable determination of the facts or an unreasonable applicable of *Strickland's* standards to those facts. Further, the state court's determinations are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary, *see* 28 U.S.C. § 2254(e)(1), which the petitioner has not submitted. This ineffective assistance of counsel claim is without merit and will be dismissed.

### 4.    Appellate counsel's alleged ineffectiveness

Finally, for each ineffective assistance of trial counsel claim, the petitioner also contends that appellate counsel provided ineffective assistance for failing to raise the underlying claim of trial counsel error as grounds for relief on direct appeal. (Doc. No. 1 at 27, 30, 32).

The Tennessee Court of Criminal Appeals rejected each of the petitioner's claims of ineffective assistance of appellate counsel. *Johnson*, 2017 WL 142754, at *9. First, the appellate court determined that, because the petitioner failed to demonstrate that the marital privilege applied to any communications between him and Ms. Battle, appellate counsel was not ineffective by failing to raise this as an issue on appeal. *Id.* Second, the appellate court found that, because trial

counsel had no legal basis for failing to file a motion to suppress Mr. Richardson's testimony, appellate counsel was not ineffective by excluding this issue in the direct appeal. *Id.* Finally, the court concluded that, because the petitioner failed to show that Mr. Anderson's testimony was inadmissible at the trial, the petitioner could not show that appellate counsel was ineffective by failing to raise this claim in the direct appeal. *Id.*

The appellate court did not unreasonably apply *Strickland* when it denied the petitioner relief on this claim. The court already had decided that counsel did not provide ineffective assistance of trial counsel when he failed to exclude the testimony of the petitioner's wife at trial as marital communication, failed to file a motion to suppress the petitioner's statement to Jaffton Richardson, and failed to argue that the testimony of Paul Anderson was the uncorroborated testimony of a co-conspirator. Therefore, these claims would not have provided appellate relief if counsel had raised the issues on direct appeal. The court finds that the appellate court's decision neither contradicted nor unreasonably applied *Strickland* under these circumstances and was not based on an unreasonable determination of the established facts. This claim, like the petitioner's other ineffective assistance of counsel claims, lacks merit and will be dismissed.

## V. Conclusion

For the reasons set forth herein, the petition filed by Myron L. Johnson seeking relief under § 2254 will be denied, and this action will be dismissed with prejudice. All of the petitioner's claims are either procedurally defaulted or fail on the merits.

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial

showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell,* 537 U.S. 322, 327 (2003). The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Because jurists of reason would not disagree with the resolution of the petitioner's claims, the court will deny a COA.

An appropriate order will be entered.

Aleta A. Trauger
United States District Judge